UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES M. FABER,<br><br>                          Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>                          Defendant. | Case No.: 16CV2781 GPC(JMA)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiff James M. Faber ("Plaintiff") seeks judicial review of the determination by Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant"), that he is not entitled to disability insurance benefits. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court recommends Plaintiff's motion for summary judgment be **DENIED** and Defendant's cross-motion for summary judgment be **GRANTED.**

//

//

# I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on June 5, 2013, alleging a disability onset date of April 1, 2012. Admin. R. at 10, 172-73.[1] Plaintiff alleged disability because of hepatitis C, panic disorder, post-traumatic stress disorder ("PTSD"), manic major depressive disorder, and psychotic behavior. Id. at 112. Plaintiff's claim was initially denied on December 19, 2013, and again upon reconsideration on February 27, 2014. Id. at 10, 112-15, 118-22. On March 11, 2014, Plaintiff filed a written request for an administrative hearing. Id. at 124-25. Administrative Law Judge ("ALJ") James S. Carletti conducted a hearing on February 19, 2015 and determined on July 10, 2015 that Plaintiff was not disabled within the meaning of the Social Security Act. Id. at 10-28.

On July 21, 2015, Plaintiff requested a review of the ALJ's decision. Id. at 6, 19. The Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on September 12, 2016. Id. at 1-3. Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

# II.  FACTUAL BACKGROUND

Plaintiff was born on April 4, 1969 and has a tenth grade education. Id. at 36, 172. Plaintiff described his childhood as "chaotic and abusive." Id. at 370. Plaintiff characterized himself as a rebellious teenager who dropped out of school at age fifteen and began working as an artist. Id. Plaintiff later worked as an airlines ramp agent, and then as a tattoo artist for fifteen years. Id. During his mid-thirties, Plaintiff moved to Detroit, Michigan, where he continued work as a

---

[1] Plaintiff's disability onset date was later amended to May 1, 2014. See Admin. R. at 13.

tattoo artist. Id. at 49. Plaintiff has never been married; however, he raised a family in Detroit for nearly nine years. Id.  From 2006 to 2010, Plaintiff worked as a tire installer at Pep Boys. Id. at 187. From December 2011 to March 2012, Plaintiff worked at a different tire shop in the same capacity. Id. at 36, 187. He stopped working in April 2012 because he was not able to concentrate. Id. at 37.

## III.  MEDICAL EVIDENCE

## A.  Palomar Medical Center, Emergency Room (June–August 2012)

On June 13, 2012, Plaintiff presented to the emergency room at Palomar Medical Center with complaints of psychiatric problems and suicidal ideations. Id. at 301. Plaintiff had recently been asked to leave his homeless shelter and was considering overdosing on pills. Id. Plaintiff reported having a history of depression, but did not exhibit any other psychiatric symptoms and was not experiencing hallucinations. Id. Plaintiff was released for outpatient follow-up after he was stabilized and referred to sobering services as he indicated he wanted to quit drinking. Id. at 303.

Two days later, on June 15, 2012, Plaintiff returned to the emergency room complaining of a migraine and suicidal feelings. Id. at 267. Although attempts were made to persuade Plaintiff not to leave, he left the emergency room before being discharged. Id. On June 20, 2012, Plaintiff arrived at the emergency room via ambulance, and was treated for symptoms including bilateral hand clenching and tremors from alcohol withdrawal. Id. at 260. Plaintiff admitted to drinking a 12-pack of beer daily. Id. Dr. Michele A. Grad gave Plaintiff information on alcohol withdrawal and suggested outpatient follow-up. Id. at 261.

On August 19, 2012, Plaintiff again visited the emergency room, this time in police custody, with superficial lacerations on both wrists. Id. at 252-53. Plaintiff did not report any suicidal or homicidal ideations or visual hallucinations. Id. at 253. Plaintiff reported he used alcohol and tobacco regularly. Id.

**B. Rogelio Samorano, M.D., Treating Physician (July 2012–August 2013)**

On July 11, 2012, Plaintiff presented to Neighborhood Healthcare for a behavioral health psychiatric intake evaluation by Dr. Rogelio Samorano. Id. at 369. During the visit, Plaintiff complained he was in a depressed mood and suffered from anhedonia (inability to experience pleasure) most of the day, nearly every day. Id. Plaintiff also complained of poor appetite, insomnia, psychomotor agitation, feelings of being slowed down, fatigue, decreased concentration, suicidal thoughts, and an inability to function. Id. Plaintiff claimed all of these symptoms affected him nearly every day. Id. Plaintiff stated he "[saw] thing[s]" and "hear[d] voices blaming [him] for stuff." Id. Dr. Samorano reported Plaintiff suffered from panic attacks with "palpitations, diaphoresis, dizziness, lightheadedness, and paresthesia." Id. Plaintiff rated the effectiveness of his medication as "poor" but with no side effects. Id. at 370.

Plaintiff informed Dr. Samorano he had been seeing Dr. Solomon for the past five years. Id. at 369.  Dr. Solomon had diagnosed Plaintiff with depression, PTSD, bipolar or attention deficit hyperactivity disorder, and insomnia. Id. Plaintiff explained that in May, he had been homeless and had attempted to commit suicide with his medications. Id. Plaintiff explained the three main events that caused him to develop PTSD—the death of his best friend and two separate incidents where he witnessed someone die—and also noted his father had passed away two weeks prior. Id. Dr. Samorano made the following

assessment regarding Plaintiff's mental condition: (1) major depressive disorder, recurrent episode, severe, specified as with psychotic behavior; (2) panic disorder without agoraphobia; (3) PTSD; (4) amphetamine dependence; (5) alcohol dependence; and (6) insomnia, unspecified. Id. at 371. Accordingly, Dr. Samorano refilled Plaintiff's Celexa for depression, increased Plaintiff's Vistaril for anxiety, and started Plaintiff on Mirtazapine to help with depression and sleep as well as Prazosin for nightmares and sleep. Id.

On July 25, 2012, Plaintiff reported he was still "irritable and depressed." Id. at 365. He told Dr. Samorano his response to his medication was poor. Id. However, Plaintiff said he was taking his medicine as prescribed and was not experiencing any side effects. Id. Although Plaintiff reported being sober for four weeks, he reported sleeping an average of only two to three hours a night. Id. Dr. Samorano increased Plaintiff's Mirtazapine, started Plaintiff on Trazodone, and directed him to continue taking all of his other prescribed medications. Id. On August 15, 2012, Plaintiff stated he was living in his RV after being "kicked out" of Escondido Community Sobering Services ("ECSS") housing for using his cell phone in violation of ECSS's policies. Id. at 361. Plaintiff described his medications as "cool" and explained that even though his Trazodone medicine gave him nightmares, the Mirtazapine counteracted the nightmares. Id. There were no further changes in Plaintiff's medications. Id.

On September 5, 2012, Plaintiff described a recent altercation he had with the police. Id. at 358. Plaintiff's right hand was bruised and he claimed his wrists bled due to the tightness of the handcuffs. Id. Plaintiff said he was in his RV, not doing anything, when the police told him to freeze. Id. The police accused him of pointing a laser at them, although Plaintiff denied any such behavior. Id. Plaintiff also expressed plans to move out of the country after receiving an

inheritance. Id. Despite the incident with the police, Plaintiff felt his medication was working. Id. On October 3, 2012, Plaintiff complained of trouble sleeping, but reported his response to his medicine was fair. Id. at 355. Additionally, Plaintiff proudly reported he was two weeks sober from alcohol, and mentioned plans to appeal his Social Security Disability case. Id. Dr. Samorano increased Plaintiff's Trazodone and recommended Plaintiff continue with his previously prescribed regimen for all other medications. Id. On October 31, 2012, Plaintiff reported his sleep was "okay" but he was "lonely." Id. at 352. Dr. Samorano decreased Plaintiff's Mirtazapine dosage and directed him to stop taking it after two weeks due to excessive weight gain. Id. at 353. Dr. Samorano also noted Plaintiff was "stressed" about his disability claim. Id.

On November 29, 2012, Plaintiff stated his symptoms were pretty well controlled except he still struggled with nightmares. Id. at 349. Plaintiff reported he had had a few drinks, but denied heavy drinking. Id. During the visit, Plaintiff asked Dr. Samorano to complete a temporary disability form. Id. On December 28, 2012, Plaintiff explained he regularly woke from nightmares in extreme panic. Id. at 346. Plaintiff reported he was properly following his prescriptions and stated his response to his medication was still fair. Id. Dr. Samorano increased Plaintiff's Prazosin and Risperidone to help with nightmares and sleep and kept all of Plaintiff's other medications the same. Id. at 347.

On February 7, 2013, Dr. Samorano noted Plaintiff had been noticeably less irritable over the past couple of months and had shown a period of relative stability. Id. at 344. Dr. Samorano started Plaintiff on Diazepam (Valium) at bedtime to aid with sleep. Id. On March 7, 2013, when asked about his response to his medications, Plaintiff responded, "the valium thing worked," and indicated his ability to sleep was improving. Id. at 340. Still, he reported his

overall medication response was only fair. <u>Id.</u> In addition to talking about his medications, Plaintiff complained about family and financial issues. <u>Id.</u> Dr. Samorano observed, "Patient currently struggling with depressed mood, fatigue, difficulties concentrating, and feelings of worthlessness. Many of patient's cognitive distortions explored and debunked." <u>Id.</u> at 341.

On April 8, 2013, Plaintiff expressed concern about bill collectors and claimed they had taken all of his money. <u>Id.</u> at 335. Plaintiff was also concerned because his only source of income, his temporary disability, was set to run out the following month. <u>Id.</u> Plaintiff mentioned Valium helped significantly and requested assistance refilling the prescription. <u>Id.</u> Dr. Samorano also continued Plaintiff on all of other his medications. <u>Id.</u>  On April 30, 2013, Plaintiff informed Dr. Samorano that panic attacks regularly caused him to wake up. <u>Id.</u> at 332. He described the attacks as causing shortness of breath and an inability to fall back asleep. <u>Id.</u> Plaintiff reported he was stressed about being unable to pay the rent, and frightened about ending up on the streets again. <u>Id.</u> Nevertheless, Plaintiff reported he was completely adhering to his medication and his response to his medications was fair without side effects. <u>Id.</u> Dr. Samorano did not change any of Plaintiff's medication. <u>Id.</u> On May 8, 2013, Plaintiff complained of being unable to sleep through the night. <u>Id.</u> at 328.

On August 28, 2013, Plaintiff complained about being stressed because of his disability claim. <u>Id.</u> at 324. Plaintiff was physically shaking, and stated he was also battling nightmares and waking up from extreme night sweats. <u>Id.</u> Dr. Samorano rated his response to his medications as fair to poor, stopped Plaintiff's prescription for Bupropion (antidepressant and smoking cessation aid), and again prescribed Seroquel, an antipsychotic. <u>Id.</u> at 325-26.

//

**C.    Palomar Medical Center (Hospital Admission) (September 2013)**

On September 1, 2013, Plaintiff was evaluated by Dr. Craig M. Burrows at Palomar Medical Center following a suicide attempt. Id. at 273. Plaintiff was intubated and not able to provide any history or information. Id. at 274. Dr. Burrows noted Plaintiff's multiple visits to the emergency room over the last couple of years related to acute alcohol intoxication. Id. at 284. He further noted Plaintiff's past psychiatric evaluations for depression and suicide attempts. Id. at 273.  This time, Plaintiff had apparently left a note saying "good bye world" and had ingested a number of pills, including benzodiazepines, antidepressants, and sleeping aids. Id. at 284. His blood alcohol level reflected he had consumed a "significant amount of alcohol." Id. Dr. Burrows suggested, given this was not Plaintiff's first event of attempting to harm himself, that there was an increased likelihood Plaintiff would need impatient psychiatric management. Id. at 276. Plaintiff's friends, who were at the hospital, told Dr. Burrows that Plaintiff was out of work and was living in his RV in Valley Center. Id. at 274. They indicated that for the last several years, Plaintiff had drunk "significant amount[s] of alcohol everyday." Id.

Plaintiff was admitted to the hospital for seven days until September 8, 2013. Id. at 279. On September 6, 2013, Dr. Marina Katz reported that despite Plaintiff's history of alcoholism and at least "4 or 5 pervious suicide attempts under similar circumstances," Plaintiff was "calm, pleasant, and cooperative" during her evaluation. Id. Furthermore, Plaintiff denied suicidal ideations and expressed a willingness to attend Alcoholic Anonymous meetings. Id.  Plaintiff admitted he had not been compliant with his psychotropic medications. Id. Still, Plaintiff reported he was happy and hopeful about a new job, and was glad his suicide attempt failed. Id. Plaintiff also denied being depressed, anxious, or

having any suicidal or homicidal ideations, and Dr. Katz found no evidence of psychosis. Id. at 277. Dr. Katz's diagnoses included alcohol dependence, alcohol-induced mood disorder, and rule out major depressive disorder and bipolar disorder, type two. Id. She recommended Plaintiff reside in a sober living treatment facility, prescribed Remeron at bedtime for depression and anxiety, and strongly warned against using any sedative hypnotics or pain medications. Id. at 278.

### D.   Dr. Samorano, Treating Physician (October 2013-January 2015)

On October 16, 2013, Plaintiff described suicidal ideations to Dr. Samorano, but called himself a "coward" and stated he would never act on those feelings. Id. at 316. Plaintiff reported feeling lonely and distraught due to homelessness. Id. Dr. Samorano observed Plaintiff had not been taking his medication regularly due to a recent hospitalization, which Plaintiff claimed was due to pneumonia, and homelessness. Id. Dr. Samorano ceased Plaintiff's prescription for Diazepam because of continued alcohol use, and stopped Plaintiff's use of Seroquel. Id. at 318. Dr. Samorano continued to refill Plaintiff's Celexa and Prazosin. Id.

On November 7, 2013, Plaintiff aired frustrations about being homeless and his difficulty getting his disability claim approved. Id. at 383. Although Plaintiff complained of feeling worthless, he did not report any suicidal or homicidal ideations, or any audio or visual hallucinations. Id. Plaintiff told Dr. Samorano he was no longer consuming alcohol and was interested in entering a sober living facility. Id. Plaintiff also reported he was adhering to his medication and his response to his medication was fair. Id. On December 12, 2012, Plaintiff mentioned financial and housing stressors and indicated he was "couch surf[ing]." Id. at 379. Although Plaintiff reported he was adhering to his

medication plan, he claimed his response to the medicine was "poor." Id. Dr. Samorano stopped Plaintiff's Quetiapine, an antipsychotic, due to dry mouth and started Plaintiff on Seroquel XR, a different antipsychotic. Id. at 381.

On January 16, 2014, Plaintiff reported he still felt depressed, despite adherence to his medication. Id. at 375. Although his Seroquel XR gave him "cotton mouth," Plaintiff's response to his medications was fair. Id. Dr. Samorano replaced Seroquel XR with Trazodone. Id. at 377. Dr. Samorano refilled Hydroxyzine and instructed Plaintiff to continue taking it three times a day as needed for severe anxiety. Id. On February 13, 2014, Plaintiff was still homeless and despite adhering to his medication, claimed to be struggling to "block out the voice." Id. at 403. Dr. Samorano prescribed Risperidone to treat schizophrenia and bipolar disorder. Id. at 405.

In April 2014, Plaintiff lamented his disability claim was denied for the third time. Id. at 399. Plaintiff denied any substance abuse and claimed to be adhering to his medications. Id. Plaintiff complained of auditory derogatory hallucinations. Id. at 395. Dr. Samorano made no changes to Plaintiff's medication, and provided Plaintiff with information about positive thinking and emotional support. Id. at 396, 400-01.

In a letter dated June 6, 2014, Dr. Samorano reported Plaintiff had been compliant with his visits and medications, but despite Plaintiff's efforts to enter the workforce, Plaintiff was unable to maintain employment due to depression, anxiety, difficulties concentrating, and impulsivity. Id. at 408. Based on a depression screening performed that day, where Plaintiff indicated he thought he would be better off dead "more than half the days," Dr. Samorano concluded Plaintiff had severe depression. Id. at 411.

On August 8, 2014, Plaintiff attended a follow-up visit where Dr.

Samorano rated him "moderately severely depressed." Id. at 444. Plaintiff reported recurrent panic attacks, continued insomnia, and depression. Id. Though Plaintiff stated his response to medication was poor, Dr. Samorano noted Plaintiff's adherence to medication was also poor. Id. Despite his poor response to his medication, Plaintiff claimed the "nightmare medication" and the Hydroxyzine worked. Id. Dr. Samorano noted Plaintiff had normal gait and station, linear thought processes, intact recent and remote memory, intact attention span and concentration, a normal fund of knowledge, and a normal rhythm of speech. Id. at 445. Dr. Samorano counseled Plaintiff on medication compliance. Id.

On August 22, 2014, Dr. Samorano completed a Mental Medical Source Statement for Plaintiff. Id. at 413. He reported Plaintiff suffered from major depression disorder with psychotic features, panic disorder, PTSD, alcohol dependence, and insomnia. Id. Dr. Samorano rated Plaintiff's response to pharmacology treatment as poor, and his prognosis as poor to fair. Id. Dr. Samorano opined Plaintiff's mental abilities and aptitudes would preclude his performance at work for 10-15% of an eight-hour workday, and would cause him to be absent from work more than four days per month. Id. at 414-15.

On December 3, 2014, Plaintiff stated he had continued to try to enter the workforce but continued to have interpersonal problems resulting in him being terminated from the positions he held. Id. at 436. He also described having had a couple of severe panic attacks in the past month. Id. Dr. Samorano completed another Mental Medical Source Statement during the visit. Id. at 417. On December 17, 2014, Plaintiff complained of a panic attack that lasted three hours, but denied having any suicidal ideations, homicidal ideations, or visual hallucinations. Id. at 433. Plaintiff reported he was adhering to his medication

1  and his response to his medications was fair. Id. Dr. Samorano allowed Plaintiff
2  to "process his feelings" regarding his mother's recent assault. Id. On January 7,
3  2015, Plaintiff recounted a family crisis and stated his Diazepam medication
4  helped him get through the situation. Id. at 430. Plaintiff also stated he had had
5  panic attacks for two days in a row. Id. Dr. Samorano stopped Plaintiff's
6  Quetiapine, started Plaintiff on Risperidone for schizophrenia and bipolar
7  disorder, and continued all of Plaintiff's other medications. Id. at 431-32.

8  **E.    Gina Rivera-Miya M.D. (Non-Treating State Agency Physician)**

9  On November 11, 2013, Dr. Gina Rivera-Miya reviewed Plaintiff's records
10 and found Plaintiff able to perform unskilled work. Id. at 87. She opined Plaintiff
11 would function best with limited public contact. Id. Dr. Rivera-Miya found Plaintiff
12 was moderately limited in his ability to understand, remember, and carry out
13 detailed instructions, and to interact appropriately with the general public, but
14 did not otherwise have any significant limitations in his mental residual
15 functional capacity. Id. at 91-93.

16

17 **IV.    THE ADMINISTRATIVE HEARING**

18 The ALJ conducted an administrative hearing on February 19, 2015. Id. at
19 33. Plaintiff, a medical expert, and a vocational expert testified. Id. at 33-69.

20 **A.    Plaintiff's Testimony**

21 Plaintiff testified he was forty-four years old and had a tenth grade
22 education. Id. at 36. Plaintiff's most recent work was as a tire installer, which he
23 performed for five years. Id. Prior to his tire installer job, he worked as a gas
24 station attendant and a tattoo artist. Id. Plaintiff testified he had not been able to
25 work for the last fifteen years. Id. at 37. Recently, Plaintiff had been supporting
26 himself by "couch surfing" and "doing chores," such as vacuuming and dusting,

27

around friends' houses. Id. at 38. Plaintiff testified he became disabled on April 12, 2012, because he was unable to concentrate, due in part to his PTSD. Id. Plaintiff testified the bases for his disability claim were his severe depression, nightmares, and inability to concentrate. Id. at 39.

Plaintiff testified he had received treatment from Dr. Samorano with Neighborhood Healthcare for three years, and to his knowledge, Dr. Samorano was a psychiatrist because "when I go to see him he sits down and we talk for like an hour." Id. at 39. Plaintiff's medication, prescribed by Dr. Samorano, included 40 milligrams of citalopram, once a day for depression; 6 milligrams of Prazosin for nightmares and sleep aid; 100 milligrams of Quetiapine for sleep; and 50 milligrams of Hydroxyzine, three times a day, for anxiety. Id. at 40-41. Plaintiff testified he took all of his medication according to Dr. Samorano's recommendations. Id. Although Plaintiff testified his medication did not help him improve, he also claimed, "they're helping me" and "it's a lot better than it was" because "it's evened out." Id. at 42. When asked if he thought his current medication regimen would enable him to return to work, Plaintiff answered, "No. No. No, there's no way. There's no way, uh-uh." Id. at 46. Plaintiff mentioned he tried to work through the Labor Ready program, but was told to "just get off the site." Id.

Plaintiff testified he initially thought alcohol was causing his mental issues; however, after becoming sober, the issues persisted. Id. at 43. Plaintiff testified he was no longer drinking alcohol and had been attending Alcoholics Anonymous meetings for the last nine to ten months. Id. When asked whether he had an alcohol relapse in the last twelve months, Plaintiff answered he had not; however, he later testified he had relapsed for one day in November. Id. at 46, 55. Plaintiff also stated he had been in remission from amphetamine

dependence for between fourteen and sixteen years. Id. at 44. The ALJ asked Plaintiff if he had ever considered living in sober living facilities. Id. at 57. Plaintiff responded he was unaware of certain programs and he could not afford the $300 to $325 rent of the program with which he was familiar. Id.

Although Plaintiff was reluctant to discuss the bases for his PTSD, he explained he had watched someone burn to death in a car; his good friend of eighteen years was shot twice in the head; and his very good friend, who was like a brother to him, was hit by a drunk driver on his motorcycle and killed. Id. at 44. Plaintiff also testified about his past suicide attempts. Id. at 45. Plaintiff said he tried to commit suicide by taking "too much of [his] medication" three years before. Id. However, he also testified that since he had been sober, he no longer had suicidal thoughts. Id. Still, Plaintiff claimed he experienced auditory hallucinations about three to four times a week, which interfered with his concentration. Id. at 46. Plaintiff testified his anxiety caused him to wake up in the morning around 4:00 a.m. feeling "starry-eyed" and short of breath, like he "just ran five miles." Id. Plaintiff also explained he is paranoid because he feels people are after him. Id. at 47. When his friend, who was like a brother to him, was murdered in 1992, a "hit list" was found at the murderer's house. Id. Plaintiff's name was on the hit list. Id. Although he does not currently think he is on someone's hit list, he is always worried about it. Id.

**B.    Medical Expert Testimony**

Medical expert ("ME") witness John M. Dusay, M.D., a psychiatrist, testified at the administrative hearing. Id. at 48. The ME noted that although Plaintiff said he had been sober for nearly nine months, Plaintiff had suffered from a relapse the previous November (three months prior to the hearing). Id. at 55. The ME also noted that Plaintiff had been able to work after the 1992

tragedy that triggered his PTSD. Id. at 48. Plaintiff subsequently clarified he could "barely" work and "got fired on all my jobs." Id.

The ME concluded Plaintiff suffered from major depression, panic disorder, PTSD, amphetamine dependence in remission, and alcohol dependence, unspecified. Id. at 52. He stated Plaintiff was not in a total and fully sustained remission from alcohol, which he deemed a "very serious problem, certainly earlier in the records." Id. The ME observed the previous November was not long ago, and thus it would be too difficult to determine what kind of problems would remain if Plaintiff were completely sober. Id. at 53. He was unable to determine from the records whether Plaintiff would still suffer from his issues absent alcohol abuse. Id. at 56.

The ME testified that up until at least September 2013, Plaintiff met Listing 12.09 (substance addition disorders). Id. at 52. However, the ME could not determine whether he would meet a listing without alcohol because alcohol "very much potentiates all of the conditions he has." Id. at 61. The ME did not believe Plaintiff met Listing 12.04 (affective disorders) on an ongoing basis. Id. The ME testified he thought Plaintiff "will have the opportunity of doing quite well." Id. However, he opined that until Plaintiff was completely sober for a substantial amount of time, he would continue to have both depression and anxiety for several months. Id. at 61-62. The ME stated that if Plaintiff were to work, he would likely miss an average of four days a month. Id. at 62.

## C. Vocational Expert Testimony

Vocational expert ("VE") witness Nelly Katsell, M.S., testified at the administrative hearing. Id. at 63. The VE classified Plaintiff's past relevant work activity of tire changer as a semi-skilled heavy occupation with non-transferable skills to other sectors. Id. at 63-64. The ALJ asked the VE a hypothetical

16cv2781 GPC(JMA)

involving assumptions that the individual's past work was heavy and semi-skilled with no transferability of skills, that the individual did not have physical limitations, but had limitations to public contact and occasional interaction with co-workers and supervisors, and the individual's work was simple and repetitive. Id. at 64. The VE responded that similar prior work would not be available to that individual, but there would be other viable work options. Id. These options included working as a hand packager, garment folder, or eye drop assembler. Id. at 64-65. When asked by Plaintiff's attorney whether a person with significant limitations in performing simple, routine tasks due to deficits in concentration, persistence, and/or pace would be able perform those jobs, the VE responded that a person would not be able to successfully perform such work. Id. at 65-66.

**V.    THE ALJ DECISION**

　　After reviewing the record, ALJ Carletti made the following findings:

> ….
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since May 1, 2014, the amended alleged onset date (citation omitted).
>
> ….
>
> 3. [Plaintiff] has the following severe impairments:  Major Depressive Disorder, Recurrent, Specified with Psychotic Behavior; Panic Disorder without Agoraphobia; Post-Traumatic Stress Disorder; Amphetamine Dependence, in Remission; and Alcohol Dependence, Unspecified (citation omitted).
>
> ….
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments [the Social Security Regulations] (citations omitted).

….

5. After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: 1) [Plaintiff] is limited to no public contact; 2) [Plaintiff] is limited to occasional interactions with coworkers and supervisors; and 3) [Plaintiff] is limited to simple, repetitive tasks.

….

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (citations omitted).

….

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from May 1, 2014, through the date of this decision (citation omitted).

Id. at 13-28.

## VI.  STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must

16cv2781 GPC(JMA)

meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the Plaintiff is presently working in any substantial gainful activity. If so, the Plaintiff is not disabled. If not, the evaluation proceeds to step two. (2) Whether the Plaintiff's impairment is severe. If not, the Plaintiff is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the Plaintiff is disabled. If not, the evaluation proceeds to step four. (4) Whether the Plaintiff is able to do any work he has done in the past. If so, the Plaintiff is not disabled. If not, the evaluation continues to step five. (5) Whether the Plaintiff is able to do any other work. If not, the Plaintiff is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the Plaintiff can do, the Plaintiff is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

## B.    Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by

substantial evidence in the record as a whole. <u>Schneider v. Comm'r of Soc. Sec. Admin.</u>, 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459 (9th Cir. 2001); <u>Desrosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009) (citing <u>Andrews</u>, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. <u>Vasquez</u>, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the SSA for further proceedings. <u>Id.</u>

## VII.   DISCUSSION

Plaintiff contends the ALJ erred by failing to articulate clear and convincing reasons for rejecting his testimony. Pl.'s Mem. at 4-9.

In determining a claimant's residual functional capacity[1] at steps four and five of the sequential evaluation process, the ALJ must consider all relevant

---

[1]   Residual functional capacity ("RFC")  is defined as "the most you can still do despite your limitations." <u>See</u> 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, ... mean[ing] 8 hours per day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (emphases omitted).

evidence in the record, including medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5). "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p, 1996 WL 374184, at *5; see also 20 C.F.R. § 404.1529(c)(3). When considering the extent to which a claimant's symptom testimony must be credited, the ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison v. Colvin, 759 F.3d 995, 1014-15 (9th Cir. 2014)). If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his or her symptoms only by offering "specific, clear and convincing reasons" for doing so. Id. (citing Garrison, 759 F.3d at 1014-15).

Here, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms "not entirely credible."[2] He articulated the following reasons for discounting the alleged severity of Plaintiff's

---

[2] At the time of the ALJ's decision, Social Security Ruling ("SSR") 96-7p provided that evaluation of a claimant's symptoms "requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects . . . ." SSR 96-7p, 1996 WL 374186 (1996). In March 2016, SSR 96-7p was superseded by SSR 16-3p to "eliminat[e] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term" and to "clarify that subjective symptom evaluation is not an examination of an individual's character" but instead should be consistent with the SSA's regulatory language regarding symptom evaluation. SSR 16-3p, 2017 WL 5180304 (2017). SSR 16-3 became applicable on March 28, 2016, after the ALJ's decision in this matter. Id.

subjective symptoms: (1) Plaintiff's condition had been stable with medication without reported side effects; (2) the "sparse level of detail" in Dr. Samorano's progress notes; (3) Plaintiff's conservative treatment regimen; (4) Plaintiff's benign psychiatric examinations and the absence of evaluations of his cognitive functioning; and (5) Plaintiff's ability to work after his alleged onset of PTSD. Admin. R. at 19-22.

## A.    Stable Condition with Medication

With respect to his first reason for discounting Plaintiff's subjective symptom testimony, that Plaintiff's condition was stable with medication without reported side effects, the ALJ noted instances in which Plaintiff exhibited improved symptoms, stated his mediations were helping, and appeared well groomed with fair hygiene. See Admin. R. at 19-20. In December 2014, Dr. Samorano determined Plaintiff had fair control of his symptoms and offered augmenting strategies, but Plaintiff decided to continue with present management as his medications were working well. Id. at 20 (referring to Admin. R. at 436-38). The ALJ further noted Plaintiff's noncompliance with his medications likely contributed to exacerbations of Plaintiff's symptoms, lending support to his finding that Plaintiff's condition was stable when adhering to his medications. Id. at 19. For example, on June 6, 2014, during a visit in which Plaintiff appeared severely depressed, Plaintiff admitted to missing two to three doses of medication per week. Id. (referring to Admin. R. at 411). Likewise, on August 8, 2014, when Plaintiff reported feeling "depressed … super stressed," Dr. Samorano noted Plaintiff's lack of compliance with his prescription medications and counseled Plaintiff on medication adherence. Id. (referring to Admin. R. at 444-46). The ALJ also observed that Plaintiff had occasions of doing well notwithstanding his medication non-compliance. Id. at 20. The ALJ

found that despite Plaintiff's allegation that he is unable to work due to depression, panic disorder, and PTSD, the record showed his symptoms were controlled with medication, even when he was not fully compliant. The ALJ could properly rely upon this finding to discredit the alleged severity of Plaintiff's subjective symptoms. See Odie v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983) (ALJ may properly consider whether treatment provided fair response); Ash v. Berryhill, 676 Fed. Appx. 632, 632 (9th Cir. 2017) (ALJ could rely upon evidence the claimant's medications had been "relatively effective" in controlling symptoms to discount claimant's testimony); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (the failure to follow prescribed treatment may "cast doubt on the sincerity of the claimant's pain testimony."). The ALJ's first stated reason for discounting Plaintiff's testimony is clear and convincing.

**B.     "Sparse Level of Detail" in Treating Doctor's Notes**

With regard to his second reason for discounting Plaintiff's symptom testimony, the ALJ explained, "Notably, there is a sparse level of detail contained within treating psychiatrist Rogelio Samorano's progress notes . . . [which] belie[s] the intensity and resultant degree of limitation that has been alleged by the claimant . . . ." Admin. R. at 19. The ALJ observed that although Plaintiff reported recurrent panic attacks on August 8, 2014, the "treatment notes provide no indication of their alleged frequency, intensity, duration, or trigger, which may indicate that they are not as severe as alleged in connection with the claimant's application." Id. at 19-20 (referring to Admin. R. at 444-47). Similarly, on April 30, 2014, when Plaintiff reported auditory derogatory hallucinations, Dr. Samorano made no indication in the treatment notes of the frequency, intensity, duration, or content of the hallucinations. Id. at 19 (referring to Admin. R. at 394-96). Moreover, the extent of treatment provided by Dr. Samorano during this visit

was instruction in positive thinking (id.), leading the ALJ to surmise this was due to Plaintiff's symptoms not being as severe or limiting as alleged. Dr. Samorano, however, never made any indication in his records that he found Plaintiff's panic attacks or hallucinations or other symptoms to be not believable or not severe, and the Court does not agree with the ALJ that his records were "sparse" in detail.  Accordingly, the Court declines to consider the ALJ's second proffered reason to be a clear and convincing reason to discount Plaintiff's subjective symptom testimony.

## C.    Conservative Treatment Regimen

An ALJ may properly rely upon the use of conservative treatment to discount a plaintiff's symptom testimony. See, e.g., Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007). Plaintiff's prescribed medications include, or have included, the following: Diazepam/Valium (for sleep and anxiety), Seroquel (antipsychotic), Celexa (antidepressant), Prazosin (for sleep), Quetiapine (antipsychotic), Trazodone (antidepressant), Hydroxyzine (anxiety), Risperidone (antipsychotic), Vistaril (anxiety), Mirtazapine (antidepressant), and Bupropion (antidepressant).  "Conservative treatment" may include prescription medications. See, e.g., Martin v. Colvin, 2017 WL 615196, at *10 (E.D. Cal. 2017); Luevano v. Berryhill, 2017 WL 2413686, at *6 (C.D. Cal. 2017). However, courts have recognized some of Plaintiff's prescription medications to constitute mental health treatment that is not "conservative." See, e.g., Tollison v. Colvin, 2015 WL 226023, at *5 (C.D. Cal. 2015) (Diazepam/Valium and Trazodone); Benjamin v. Colvin, 2014 WL 4437288, at *3 (C.D. Cal. 2014) (Seroquel). It follows that anxiety medications other than Diazepam/Valium, such as Hydroxyzine and Vistaril, and antipsychotics other than Seroquel, such as Quetiapine and Risperidone, are also not "conservative." Accordingly, the Court

cannot find the ALJ's discounting of Plaintiff's subjective symptoms based upon a supposed "conservative treatment" regimen to be clear and convincing.

**D.    Psychiatric and Cognitive Evaluations**

The ALJ's fourth stated reason for discounting the severity of Plaintiff's alleged symptoms rests upon Plaintiff's "benign" psychiatric examinations and the absence of evaluations of cognitive functioning in the record. Although an ALJ may not disregard a claimant's testimony "*solely* because it is not substantiated affirmatively by objective medical evidence" (see Robbins, 466 F.3d at 883 [emphasis added]), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation. See Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.") Here, the Court agrees with the ALJ that the psychiatric examinations in the record "appear largely benign and unchanged with few exceptions since or around the amended alleged onset date." Admin. R. at 21. As the ALJ observed:

> In particular, while the claimant has consistently displayed with a restricted affect, he has made good eye contact and been generally observed with casual dress and fair hygiene . . . . [H]e has been assessed with normal rate, volume, and rhythm of speech with intact language; a normal fund of knowledge; intact recent and remote memory, concentration/attention span, and associations; and fair judgment and insight. Furthermore, although he has occasionally reported derogatory auditory hallucinations, he has consistently denied experiencing any delusions or command or visual hallucinations. . . . [T]o the extent that the claimant's psychiatric examination findings do reveal some change in mental impairment-related symptoms over time since the amended alleged onset date, the undersigned emphasizes that the changes are relatively minor; significantly, . . . these changes are also based entirely on the

claimant's subjective reports that he experiences changing moods (e.g. bad, stressed/superstressed, depressed, upset, angry) and occasional derogatory auditory hallucinations without command hallucinations.

Id. Furthermore, and importantly, the ALJ found that Plaintiff's mental functioning had not been evaluated to the extent one would expect to see if his impairment-related limitations were as limiting as alleged by Plaintiff. Id. The record does not contain:

[D]etailed reports/results from in-depth testing/examination of cognitive functioning relating to such areas as orientation, digit span, attention and calculation, memory (registration, recall, and delayed recall), alphanumeric counting or sequencing, fund of information, vocabulary, simple math, abstraction/proverbs, similarities, judgment and comparison, language, perception/coordination, effort, or mini mental status examination scores.

Id. Additionally, there is no indication in the record that Plaintiff was administered testing to measure his concentration; therefore, there is little evidence in the record supporting Plaintiff's allegation of problems with concentration. Given the minimal medical evidence in the record supporting Plaintiff's alleged symptoms, the ALJ's determination that the record does not support Plaintiff's allegations of disability is clear and convincing.

**E.    Ability to Work**

The ALJ's fifth proffered reason for discounting Plaintiff's symptom testimony is that Plaintiff was able to work after the onset of his PTSD in 1992. He explains, "The undersigned . . . agrees with the impartial medical expert that the claimant's ability to work at substantial gainful activity levels after his alleged triggering incident (but prior to his amended alleged onset date) may indicate that the claimant's current PTSD symptoms are not as severe as alleged in connection with the claimant's disability application." Id. The ALJ acknowledges

"this is only one factor in the undersigned's assessment of credibility." Id. The ALJ's observation that Plaintiff was not previously prevented from working despite the presence of his alleged impairment at approximately the same level of severity may constitute a clear and convincing reason to discredit Plaintiff's symptom testimony. See Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (providing that an ALJ may properly consider a claimant's work record when weighing a claimant's credibility). Therefore, the ALJ could properly find Plaintiff's testimony regarding his inability to work due in part to PTSD was undermined by his ability to work after 1992.

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 977 F.2d 20, 22 (9th Cir. 1989). Although not all of the reasons set forth by the ALJ are clear and convincing, the Court concludes the ALJ articulated sufficient specific, clear and convincing reasons supported by substantial evidence to discount Plaintiff's subjective symptom testimony.

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment should be **DENIED** and Defendant's cross-motion for summary judgment should be **GRANTED**.

This report and recommendation will be submitted to the Honorable Gonzalo P. Curiel, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before January 23, 2018. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before February 2, 2018. The parties are advised that failure to file

objections within the specified time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  December 29, 2017

Jan M. Adler
U.S. Magistrate Judge