UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES M. FABER,<br><br>                              Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>                              Defendant. | Case No.: 3:16-cv-02781-GPC-JMA<br><br>**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[DKT. NO. 19.]** |

On November 10, 2016, Plaintiff James M. Faber ("Plaintiff" or "Claimant") filed a complaint seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for disability insurance benefits. (Dkt. No. 1.) On December 29, 2017, Magistrate Judge Jan M. Adler issued a report and recommendation ("Report") recommending Plaintiff's motion for summary judgment be denied and that Defendant's cross-motion for summary judgment be granted. (Dkt. No. 19.) No objections were filed by the deadline date of January 23, 2018 and no extension of time was requested. After careful consideration of the pleadings, the supporting documents, and the applicable law, the Court **ADOPTS** in part

1

the Magistrate Judge's Report, **DENIES** Plaintiff's Motion for Summary Judgment, and **GRANTS** Defendant's Motion for Summary Judgment.

## I.     PROCEDURAL BACKGROUND

On June 5, 2013, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act ("Act") alleging a disability date of April 1, 2012. (Administrative Record ("AR") 10, 172-73.)[1] Plaintiff alleged disability because of hepatitis C, panic disorder, post-traumatic stress disorder ("PTSD"), manic major depressive disorder, and psychotic behavior. (AR 112.) Plaintiff's claim was initially denied on December 19, 2013, and again upon reconsideration on February 27, 2014. (AR 10, 112-15, 118-22.)

On March 11, 2014, Plaintiff filed a written request for an administrative hearing. (AR 124-25.) On February 19, 2015, Plaintiff appeared with counsel and testified before Administrative Law Judge ("ALJ") James S. Carletti. (AR 10-28.) On July 10, 2015, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the Act. (AR 10-28.)

On July 21, 2015, Plaintiff requested a review of the ALJ's decision. (AR 6, 19.) The Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on September 12, 2016. (AR 1-3.) The ALJ's decision became the final decision of the Commissioner when the Appeals Counsel denied Plaintiff's request for review on September 12, 2016. (*Id*.)

On November 10, 2016, Plaintiff, commenced the instant action seeking judicial review of Defendant's decision. (Dkt. No. 1.) On May 26, 2017, Plaintiff filed his motion for summary judgment. (Dkt. No. 16.) On June 29, 2017, Defendant filed a response in opposition to Plaintiff's motion for summary judgment. (Dkt. No. 18.) Also on June 29, 2017, Defendant filed its cross motion for summary judgment. (Dkt. No. 17.). On

---

[1] Plaintiff's alleged onset of disability date was later amended to May 1, 2014. (AR 13.)

December 29, 2017, the Magistrate Judge issued the Report. (Dkt. No. 19.) No objections to the Report were filed. (*See* Dkt. No. 19) (requiring written objections to be filed before January 23, 2018).

## II.  FACTUAL BACKGROUND[2]

Plaintiff alleges a disability as of May 1, 2014, his amended alleged onset date. (AR 13.) On his application, he alleged disability because of hepatitis C, panic disorder, post-traumatic stress disorder ("PTSD"), manic major depressive disorder, and psychotic behavior. (AR 35.)

### A.  Plaintiff's Testimony

At the time of the hearing before the ALJ, Plaintiff was forty-four years old. (AR 36.) Plaintiff has a tenth grade education. (*Id.*) Plaintiff described his childhood as chaotic and abusive. (AR 370.) Plaintiff characterized himself as a rebellious teenager who dropped out of school at age fifteen and began working as an artist. (*Id.*) Plaintiff later worked as airline ramp agent, and then as a tattoo artist for fifteen years. (*Id.*) During his mid-thirties, Plaintiff moved to Detroit, Michigan, where he continued work as a tattoo artist. (*Id.*) Plaintiff has never been married; however, he raised a family in Detroit for nearly nine years. (AR 49, 370.) From 2006 to 2010, Plaintiff worked as a tire installer at Pep Boys. (AR 187.) From December 2011 to March 2012, Plaintiff worked at a different tire shop in the same capacity. (AR 36, 187.) He stopped working in April 2012 because he was not able to concentrate, due in part to his PTSD. (AR 37.) Plaintiff has been supporting himself by "couch surfing" and "doing chores" such as vacuuming and dusting around friends' houses. (AR 37-38.)

Plaintiff testified that he received treatment from Dr. Samorano with Neighborhood Healthcare for three years. (AR 38-39.) Plaintiff testified that to his

---

[2] The Court substantially recites the facts as presented in the Magistrate Judge's Report.

knowledge, Dr. Samorano was a psychiatrist because "when I go to see him he sits down and we talk for like an hour." (AR 39.) Plaintiff's medications, prescribed by Dr. Samorano, included antipsychotics, medication for depression, sleep aid and anxiety. (AR 40-41, 317.) Plaintiff testified he took all of his medication according to Dr. Samorano's recommendations. (AR 41.) Although Plaintiff testified his medication did not help him improve his condition, he claimed, "they're helping me" and "it's a lot better than it was" because "it's evened out." (AR 42.) When asked if he thought his current medication regimen would enable him to return to work, Plaintiff answered, "No. No. No, there's no way. There's no way, uh-uh." (AR 46.) Plaintiff mentioned that he tried to work through the Labor Ready Program, and reported "they tried hiring me and they just told me to get off the site." (*Id.*)

Plaintiff testified he initially thought alcohol was causing his mental issues; however, after becoming sober, the issues persisted. (AR 43.) Plaintiff testified he was no longer drinking alcohol and had been attending Alcoholics Anonymous ("AA") meetings for the last nine to ten months. (AR 42-43.) When asked whether he had an alcohol relapse in the last twelve months, Plaintiff answered he had not; however, he later testified he had relapsed for one day in November. (AR 46, 55.) Plaintiff also stated he had been in remission from amphetamine dependence for between fourteen and sixteen years. (AR 44.) The ALJ asked Plaintiff if he had ever considered living in sober living facilities. (AR 57.) Plaintiff responded he was unaware of certain programs and he could not afford the estimated $300 to $325 cost of the program which with he was familiar. (AR 57-58.)

Although Plaintiff was reluctant to discuss the bases for his PTSD, he explained that he had watched someone burn to death in a car; his good friend of eighteen years was shot twice in the head in 1992; and his very good friend, who was like a brother to him, was hit by a drunk driver on his motorcycle and killed. (AR 44.) Plaintiff also testified about his past suicide attempts. (AR 45.) Plaintiff said he tried to commit suicide three

years prior to the hearing by taking "too much of [his] medication." (*Id.*) However, he also testified that since he had been sober, he no longer had suicidal thoughts. (*Id.*) Still, Plaintiff claimed he experienced auditory hallucinations about three to four times a week, which interfered with his concentration. (AR 45-46.) Plaintiff testified his anxiety caused him to wake up in the morning around 4:00 a.m. feeling "starry-eyed" and short of breath, as if he had "just ran five miles." (AR 46-47.) Plaintiff also explained he is paranoid because he feels people are after him. (AR 47.) When his friend, who was like a brother to him, was murdered in 1992, a "hit list" was found at the murderer's house with Plaintiff's name on the list. (*Id.*) Although he does not currently think he is on someone's hit list, he is always worried about it. (*Id.*)

**B.    Medical Expert Testimony**

Medical expert ("ME") witness John M. Dusay, M.D., a psychiatrist, testified at the administrative hearing. (AR 48.) The ME noted that Plaintiff had sustained substantial gainful employment since 1992, the alleged onset of his PTSD. (*Id.*) The ALJ further noted that although Plaintiff had been attending AA meetings and had been sober for about nine months, he had suffered a relapse in November (three months prior to the administrative hearing). (AR 49-50.)

Based on his review of Dr. Samorano's notes and the notes of other doctors who treated Plaintiff at Palomar Medical Center, the ME found Plaintiff demonstrated major depression; panic disorder; PTSD; amphetamine dependence in remission; and alcohol dependence, unspecified. (AR 51-52.) The ME noted Plaintiff was not in a total and full remission from alcohol, which he deemed a "very serious problem, certainly earlier in the records." (AR 52.) The ALJ testified that given Plaintiff's drinking three months prior to the hearing, it would be too difficult to tell what kind of problems would remain if Plaintiff were completely sober. (AR 53.) Further, the ME testified that he was unable to determine from the records whether Plaintiff would still suffer from his issues absent alcohol. (*Id.*)

The ME testified that up until September 14, 2013, Plaintiff would have certainly met Listing 12.09 (substance addiction disorders). (AR 52.) However, the ME testified he could not determine whether Plaintiff presently met any listing without alcohol because alcohol very much potentiates all of the conditions he has. (AR 61.) The ME testified he did not believe Plaintiff met Listing 12.04 (mood disorders) on an ongoing basis. (*Id.*) The ME opined that Plaintiff appeared "clean and sober today and he seems quite well-spoken" and that he believed Plaintiff "will have the opportunity of doing quite well." (AR 53, 61.)

### C. Vocational Expert Testimony

Vocational expert ("VE") witness Nelly Katsell, M.S., testified at the administrative hearing. (AR 63.) The VE testified that Plaintiff's past relevant work as a tire changer is classified as a semi-skilled heavy occupation with no transferability of skills. (AR 63-64.) During the hearing, the ALJ asked the VE a hypothetical question involving assumptions of a younger individual with the same level of education, work history and limitations as Plaintiff. (AR 64.) The ALJ asked whether such individual would be able to perform the prior work activity and whether any other work activity existed that could be performed. (*Id.*) The VE responded that the individual would not be able to perform the prior work activity but that there were other work options available that involved light to medium, simple, repetitive, non-public tasks. (AR 64-65.) The first option included working as a hand packager, to which there are 2,800 regional positions in San Diego and 275,000 national positions. (AR 64.) The second, option included working as a garment folder, with 4,300 regional positions and 699,000 national positions available. (AR 64-65.) The third option included working as an eyedropper assembler, with 2,900 regional positions and 375,000 national positions available. (*Id.*) The ALJ asked the VE whether a claimant could miss more than two days of work and maintain his position, to which the VE responded, "No." (AR 65.) When asked by Plaintiff's counsel whether an individual with significant limitations in performing simple, routine

tasks due to deficits in concentration, persistence and pace would be able to perform the jobs mentioned, the VE responded "No." (AR 65-66.)

### D. Medical Evidence

#### 1. Palomar Medical Center Emergency Room

Medical evidence was also relevant to the administrative judge's determination. On June 13, 2012, Plaintiff arrived at the emergency room at Palomar Medical Center with complaints of psychiatric problems and suicidal ideations. (AR 301.) Plaintiff reported he was considering overdosing on his pills because he had been recently asked to leave his homeless shelter. (*Id.*) Plaintiff also reported having a history of depression, but did not exhibit any other psychiatric symptoms and was not experiencing hallucinations. (*Id.*) Plaintiff was released for outpatient follow-up after he was stabilized and referred to sobering services as he indicated he wanted to quit drinking. (AR 303.)

Two days later, on June 15, 2012, Plaintiff returned to the emergency room complaining of a migraine and suicidal feelings. (AR 267.) However, Plaintiff left the emergency room before the medical screening exam was completed. (AR 268.) Attempts were made to persuade Plaintiff not to leave, Plaintiff left before being discharged. (*Id.*) On June 20, 2012, Plaintiff arrived at the emergency room via ambulance, and was treated for symptoms including bilateral hand clenching and tremors from alcohol withdrawal. (AR 260.) Plaintiff admitted to drinking a 12-pack of beer daily. (*Id.*) Dr. Michele A. Grad gave Plaintiff information on alcohol withdrawal and suggested outpatient follow-up. (AR 261.)

On August 19, 2012, Plaintiff again visited the emergency room. (AR 253.) Plaintiff arrived at the hospital in police custody, with superficial lacerations on both wrists. (AR 253.) During this visit, Plaintiff did not report any suicidal or homicidal ideations or visual or auditory hallucinations. (*Id.*) Plaintiff did, however, report he used alcohol and tobacco regularly. (*Id.*)

### 2. Rogelio Samorano, M.D., Treating Physician (July 2012 - August 2013)

On July 11, 2012, Plaintiff went to Neighborhood Healthcare for a behavioral health psychiatric intake evaluation by Dr. Rogelio Samorano. (AR 369.) During the visit, Plaintiff complained he was in a depressed mood and suffered from anhedonia[3] nearly every day. (*Id.*) Plaintiff also complained of poor appetite, insomnia, psychomotor agitation, feelings of being slowed down, fatigue, decreased concentration, suicidal thoughts, and an inability to function. (*Id.*) Plaintiff claimed all of these symptoms affected him "nearly every day." (*Id.*) Plaintiff also reported he "[saw] thing[s]" and hear[d] voices blaming [him] for stuff." (*Id.*) Dr. Samorano reported Plaintiff suffered from panic attacks with "palpitations, diaphoresis, dizz[iness], lightheaded[ness], and paresthesias." (*Id.*) Plaintiff rated the effectiveness of his medication as "poor" but with no side effects. (AR 370.)

Plaintiff informed Dr. Samorano he had been seeing Dr. Solomon for the past five years. (AR 369.) Dr. Solomon had diagnosed Plaintiff with depression, PTSD, bipolar or attention deficit hyperactivity disorder, and insomnia. (*Id.*) Plaintiff explained that in May, he had been homeless and had attempted to overdose with his medications. (*Id.*) Plaintiff explained the three main events that caused him to develop PTSD – the death of his best friend and two separate incidents where he witnessed someone die – and also noted his father had passed away two weeks prior. (*Id.*) Dr. Samorano made the following assessment regarding Plaintiff's mental condition: (1) major depressive disorder, recurrent episode, severe and specified as with psychotic behavior; (2) panic disorder with agoraphobia; (3) PTSD; (4) amphetamine dependence; (5) alcohol dependence; and (6) insomnia, unspecified. (AR 371.) Dr. Samorano reported Plaintiff

---

[3] "Anhedonia" refers to "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/anhedonia

was at first irritable, but halfway through the interview he became cooperative and friendly. (*Id.*) Accordingly, Dr. Samorano refilled Plaintiff's Celexa for depression, increased Plaintiff's Vistaril for anxiety, and started Plaintiff on Mirtazapine to help with depression and sleep as well as Prazosin for nightmares and sleep. (*Id.*)

On July 25, 2012, Plaintiff reported he was still "irritable and depressed." (AR 365.) Plaintiff reported he was experiencing auditory hallucinations telling him, "you are rotten. It's your fault." (*Id.*) He told Dr. Samorano his response to his medication was poor. (*Id.*) However, Plaintiff said he was taking his medicine as prescribed and was not experiencing any side effects. (*Id.*) Although Plaintiff reported being sober for four weeks, he reported sleeping an average of only two to three hours a night. (*Id.*) Dr. Samorano increased Plaintiff's Mirtazapine, started Plaintiff on Trazodone, and directed him to continue taking all of his other prescribed medications. (AR 366.) On August 15, 2012, Plaintiff stated that he was living in his RV after being "kicked out" of Escondido Community Sobering Services ("ECSS") housing for using his cell phone in violation of ECSS's policies. (AR 361.) Plaintiff described his medications as "cool" and explained that even though his Trazodone medicine gave him nightmares, the Mirtazapine counteracted the nightmares. (*Id.*) Dr. Samorano increased Plaintiff's Celexa and started him on Risperidone for depression. (*Id.*)

On September 5, 2012, Plaintiff described to Dr. Samorano an altercation he had with the police thirteen days prior to the doctor's visit. (AR 358.) Plaintiff's right hand was bruised and he claimed his wrists bled due to the tightness of the handcuffs. (*Id.*) Plaintiff said he was in his RV, not doing anything, when the police told him to freeze. (*Id.*) The police accused him of pointing a laser at them, although Plaintiff denied any such behavior. (*Id.*) Plaintiff also expressed his plans to move out of the country after receiving an inheritance. (*Id.*) Despite the incident with the police, Plaintiff felt his medication was working. (*Id.*) On October 3, 2012, Plaintiff complained of trouble sleeping, but reported his response to the medicine was fair. (AR 355.) Additionally,

Plaintiff proudly reported he was two weeks sober from alcohol, and mentioned plans to appeal his Social Security Disability case. (*Id.*) Dr. Samorano increased Plaintiff's Trazadone and recommended Plaintiff continue with his previously prescribed regimen for all other medications. (*Id.*) On October 31, 2012, Plaintiff reported his sleep was "okay" but he was "lonely." (AR 352.) Dr. Samorano decreased Plaintiff's Mirtazapine dosage and directed him to stop taking it after two weeks due to excessive weight gain. (AR 353.) Dr. Samorano also noted Plaintiff was "stressed" about his disability claim. (AR 352.)

On November 29, 2012, Plaintiff stated his symptoms were pretty well controlled except he still struggled with nightmares. (AR 349.) Plaintiff reported he had a few drinks, but denied heavy drinking. (*Id.*) During the visit, Plaintiff asked Dr. Samorano to complete a temporary disability form. (*Id.*) On December 29, 2012, Plaintiff explained he regularly woke from nightmares in extreme panic. (AR 346.) Plaintiff reported he was properly following his prescriptions and states his response to his medication was still fair. (*Id.*) Dr. Samorano increased Plaintiff's Prazosin and Risperidone to help him with nightmares and sleep and kept all of Plaintiff's other medication the same. (AR 347.)

On February 7, 2013, Dr. Samorano noted Plaintiff had been noticeably less irritable over the past couple of months and had shown a period of relative stability. (AR 344.) Dr. Samorano prescribed Plaintiff Diazepam (Valium) at bedtime to aid with sleep. (*Id.*) On March 7, 2013, when asked about his response to his medications, Plaintiff responded, "the valium thing worked," and indicated his ability to sleep was improving. (AR 340.) Still, he reported his overall medication response was only fair. (*Id.*) In addition to talking about his medication, Plaintiff complained about family and financial issues. (*Id.*) Dr. Samorano observed, "Patient currently struggling with depressed mood, fatigue, difficulties concentration [sic], and feelings of worthlessness. (AR 341.) Many of patient's cognitive distortions explored and debunked." (*Id.*)

On April 8, 2013, Plaintiff expressed concern about bill collectors and claimed they had taken all of his money. (AR 335.) Plaintiff was also concerned because his only source of income, his temporary disability, was set to run out the following month. (*Id.*) Plaintiff mentioned Valium helped significantly and requested assistance refilling the prescription. (*Id.*) Dr. Samorano also continued Plaintiff on all of his other medications. (*Id.*) On April 30, 2013, Plaintiff informed Dr. Samorano that panic attacks regularly caused him to wake up. (AR 332.) He described the attacks as causing shortness of breath and an inability to fall back asleep. (*Id.*) Plaintiff reported that he was stressed about being unable to pay the rent, and frightened about ending up on the streets again. (*Id.*) Nevertheless, Plaintiff reported he was completely adhering to his medication and his response to his medications was fair and without side effects. (*Id.*) Dr. Samorano did not change any of Plaintiff's medication. (*Id.*) On May 8, 2013, Plaintiff complained of being unable to sleep through the night. (AR 328.)

On August 28, 2013, Plaintiff complained about being stressed because of his disability claim. (AR 324.) Plaintiff was physically shaking, and stated he was also battling nightmares and waking up from extreme night sweats. (*Id.*) Dr. Samorano rated his response to his medications as fair to poor, stopped Plaintiff's prescription for Bupropion, an antidepressant, and again prescribed Seroquel, an antipsychotic. (AR 325-26.)

### 3. Palomar Medical Center Hospital Admission

On September 1, 2013, Plaintiff was evaluated by Dr. Craig M. Burrows at Palomar Medical Center following a suicide attempt. (AR 273.)  Plaintiff was intubated and not able to provide any history or information. (AR 274.) Dr. Burrows noted Plaintiff's multiple visits to the emergency room over the last couple of years related to acute alcohol intoxication. (AR 284.) He further noted Plaintiff's past psychiatric evaluations for depression and suicide attempts. (AR 273.) This time, Plaintiff had apparently left a note saying "goodbye world" and had ingested a number of pills,

including benzodiazepines, antidepressants, and sleeping aids. (AR 284.) His blood alcohol level reflected he had consumed a "significant amount of alcohol." (*Id.*) Dr. Burrows suggested, given that this was not Plaintiff's first attempt at harming himself, that there was an increased likelihood Plaintiff would need inpatient psychiatric management. (AR 276.) Plaintiff's friends, who were at the hospital, told Dr. Burrows that Plaintiff was out of work and was living in his RV in Valley Center. (AR 274.) They indicated that for the last several years, Plaintiff had drunk "significant amount[s] of alcohol everyday." (*Id.*)

Plaintiff was admitted to the hospital for seven days until September 8, 2013. (AR 279.) On September 6, 2013, Dr. Marina Katz reported that despite Plaintiff's history of alcoholism and at least "4 or 5 previous suicide attempts under similar circumstances," Plaintiff was "calm, pleasant, and cooperative" during her evaluation. (AR 277.) Furthermore, Plaintiff denied suicidal ideations and expressed willingness to attend AA meetings. (*Id.*) Plaintiff admitted he had not been compliant with his psychotropic medications. (*Id.*) Still, Plaintiff reported he was happy and hopeful about a new job, and was glad his suicide attempt failed. (*Id.*) Plaintiff also denied being depressed, anxious, or having any suicidal or homicidal ideations, and Dr. Katz found no evidence of psychosis. (AR 277.) Dr. Katz's diagnosis included alcohol dependence, alcohol-induced mood disorder, and ruled out major depressive disorder and bipolar disorder, type two. (*Id.*) She recommended Plaintiff reside in a sober living treatment facility, prescribed Remeron at bedtime for depression and anxiety, and strongly warned against using any sedative hypnotics or pain medications. (AR 278.)

### 4. Dr. Samorano, Treating Physician (October 2013 - January 2015)

On October 16, 2013, Plaintiff described suicidal ideations to Dr. Samorano, but called himself a "coward" and stated he would never act on those feelings. (AR 316.) Plaintiff reported being homeless and feeling lonely. (*Id.*) Dr. Samorano observed Plaintiff had not been taking his medication regularly due to the recent hospitalization,

which Plaintiff claimed was due to pneumonia, and homelessness. (*Id.*) Dr. Samorano ceased Plaintiff's prescription for Diazepam because of continued alcohol use, and stopped Plaintiff's use of Seroquel. (AR 318.) Dr. Samorano continued to refill Plaintiff's Celexa and Prazosin. (*Id.*)

On November 7, 2013, Plaintiff aired frustrations about being homeless and his difficulty getting his disability claim approved. (AR 383.) Although Plaintiff complained of feeling worthless, he did not report any suicidal or homicidal ideations, or any audio or visual hallucinations. (*Id.*) Plaintiff told Dr. Samorano he was no longer consuming alcohol and was interested in entering a sober living facility. (*Id.*) Plaintiff also reported he was adhering to his medication and his response to his medication was fair. (*Id.*) On December 12, 2013, Plaintiff mentioned financial and housing stressors and indicated he was "couch surf[ing]." (AR 379.) Although Plaintiff reported he was adhering to his medication plan, he claimed his response to the medicine was "poor." (*Id.*) Dr. Samorano stopped Plaintiff's Quetiapine, an antipsychotic, due to dry mouth and started Plaintiff on Seroquel XR, a different antipsychotic. (AR 381.)

On January 16, 2014, Plaintiff reported he still felt depressed, despite adherence to his medication. (AR 375.) Although his Seroquel XR gave him "cotton mouth," Plaintiff's response to his medications was fair. (*Id.*) Dr. Samorano replaced Seroquel XR with Trazodone. (AR 377.) Dr. Samorano refilled Hydroxyzine and instructed Plaintiff to continue taking it three times a day as needed for severe anxiety. (*Id.*) On February 13, 2014, Plaintiff was still homeless and despite adhering to his medication, claimed to be struggling to "block out the voices." (AR 403.) Dr. Samorano prescribed Risperidone to treat schizophrenia and bipolar disorder. (AR 405.)

In April 2014, Plaintiff lamented his disability claim was denied for the third time. (AR 399.) Plaintiff denied any substance abuse and claimed to be adhering to his medications. (*Id.*) Plaintiff complained of auditory derogatory hallucinations. (AR 395.)

Dr. Samorano made no changes to Plaintiff's medication, and provided Plaintiff with information about positive thinking and emotional support. (AR 396, 400-01.)

In a letter dated June 6, 2014, Dr. Samorano reported Plaintiff had been compliant with his visits and medications, but despite Plaintiff's efforts to enter the workforce, Plaintiff was unable to maintain employment due to depression, anxiety, difficulties concentrating, and impulsivity. (AR 408.) Based on a depression screening performed that day, where Plaintiff indicated he thought he would be better off dead "more than half the days," Dr. Samorano concluded Plaintiff had severe depression. (AR 411.)

On August 8, 2014, Plaintiff attended a follow-up visit where Dr. Samorano rated him "moderately severe depress[ed]." (AR 444.) Plaintiff reported recurrent panic attacks, continued insomnia, and depression. (*Id.*) Though Plaintiff stated his response to medication was poor, Dr. Samorano noted Plaintiff's adherence to medication was also poor. (*Id.*) Despite his poor response to his medication, Plaintiff claimed the "nightmare medication" and the Hydroxyzine worked. (*Id.*) Dr. Samorano noted Plaintiff had normal gait and station, linear thought processes, intact recent and remote memory, intact attention span and concentration, a normal fund of knowledge, and a normal rhythm of speech. (AR 445.) Dr. Samorano counseled Plaintiff on medication compliance. (*Id.*)

On August 22, 2014, Dr. Samorano completed a Mental Medical Source Statement for Plaintiff. (AR 413.) He reported Plaintiff suffered from major depression disorder with psychotic features, panic disorder, PTSD, alcohol dependence, and insomnia. (*Id.*) Dr. Samorano rated Plaintiff's response to pharmacology treatment as poor, and his prognosis as poor to fair. (*Id.*) Dr. Samorano opined Plaintiff's mental abilities and aptitudes would preclude his performance at work for 10-15% of an eight-hour workday, and would cause him to be absent from work more than four days per month. (AR 414-15.)

On December 3, 2014, Plaintiff stated he had continued to try to enter the workforce but continued to have interpersonal problems resulting in him being

terminated from the positions he held. (AR 436.) He also described having had a couple of severe panic attacks in the past month. (*Id.*) Dr. Samorano completed another Mental Medical Source Statement during the visit. (AR 417.) On December 17, 2014, Plaintiff complained of a panic attack that lasted three hours, but denied having any suicidal ideations, homicidal ideations, or visual hallucinations. (AR 433.) Plaintiff reported he was adhering to his medication and his response to his medications was fair. (*Id.*) Dr. Samorano allowed Plaintiff to "process his feelings" regarding his mother's recent assault by his brother. (*Id.*) On January 7, 2015, Plaintiff recounted this family crisis and stated his Diazepam medication helped him get through the situation. (AR 430.) Plaintiff also stated he had had panic attacks for two days in a row. (*Id.*) Dr. Samorano stopped Plaintiff's Quetiapine, started Plaintiff on Risperidone for schizophrenia and bipolar disorder, and continued all of Plaintiff's other medications. (AR 431-32.)

### 5.  Gina Rivera-Miya, M.D., Non-Treating State Agency Physician

On November 11, 2013, Dr. Gina Rivera-Miya reviewed Plaintiff's records and found Plaintiff able to perform unskilled work. (AR 87.) She opined Plaintiff would function best with limited public contact. (*Id.*) Dr. Rivera-Miya found Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, and to interact appropriately with the general public, but did not otherwise have any significant limitations in his mental residual functional capacity. (AR 91-93.)

### E.  ALJ Decision

In order to determine whether a claimant meets the definition of disabled, the ALJ employs a five-step sequential evaluation. 20 C.F.R. § 416.920(a); *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). If the ALJ determines that a claimant is either disabled or not disabled at any step in the process, the ALJ does not continue on to the next step. *See* 20 C.F.R. § 416.920(a)(4); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity;" (2) whether

the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work;" and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a). Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC. *See* 20 C.F.R. § 416.920(e); *Bray*, 554 F.3d at 1222-23. The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222.

The ALJ conducted an administrative hearing on February 19, 2015. (AR 10.) Plaintiff appeared with counsel and testified. (*Id.*) Also appearing and testifying were John M. Dusay, M.D., an impartial ME, and Nelly Katsell, an impartial VE. (*Id.*) On July 10, 2015, the ALJ issued a decision finding that Plaintiff was not disabled as defined under the Act. (AR 28.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for a review of the decision. (AR 1.)

The ALJ applied the five-step sequential framework and determined that Plaintiff is not disabled. (AR 10-28.) First, the ALJ determined that Plaintiff met the insured statute requirements of the Act through December 31, 2015. (AR 13.) Then, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2014, the amended alleged onset date. (*Id.*) At step two, the ALJ found that Plaintiff has severe impairments of major depressive disorder, recurrent, specified with psychotic behavior; panic disorder with agoraphobia; post-traumatic stress disorder; amphetamine dependence in remission; and alcohol dependence, unspecified. (*Id.*) At step three, the ALJ found that Plaintiff does not have an "impairment or combination of impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (AR 14.) At step four, the ALJ determined that Plaintiff has

the residual functional capacity[4] to perform a full range of work at all exertional levels but with the following nonexertional limitations: (1) Plaintiff is limited to no public contact; (2) Plaintiff is limited to occasional interaction with coworkers and supervisors; and (3) Plaintiff is limited to simple, repetitive tasks. (AR 18.) Pertinently, in making this determination, the ALJ discounted the relevance of Plaintiff's treating physician Dr. Rogelio Samorano, because his opinions/medical source statements—where he contended Plaintiff would have to miss more than four days in a work week—"lack[ed] internal consistency with treatment records."[5]  Relying on the vocational expert's testimony, the ALJ concluded Plaintiff is unable to perform past relevant work. (AR 26.)

Further relying on the vocational expert's testimony, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (AR 26.) Therefore, the ALJ concluded Plaintiff has not been under a disability as defined under the Act since May 1, 2014 through the date of the decision of July 10, 2015. (AR 28.)

## III.    LEGAL STANDARD

### A.    Standard of Review of Magistrate Judge's Report

The district judge must "make a *de novo* determination of those portions of the report … to which objection is made," and "may accept, reject, or modify, in whole or in

---

[4] Residual functional capacity ("RFC") is defined as "the most you can still do despite your limitations." See 20 C.F.R. § 404.1545(a)(1). "Ordinarily, RFC is the individual's maximum rendering ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, … mean[ing] 8 hours per day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted).

[5] Specifically, the ALJ faulted Dr. Samorano's inconsistent statement that "claimant had a poor response to pharmacotherapy," where the doctor's treatment records showed "benign findings, minimal treatment, minimal overall change in the claimant's current medication regimen, and admissions by the claimant that he is content with and benefitting from his medication regimen." (AR 22.)  Moreover, the ALJ found that Dr. Samorano lacked a basis to assess Plaintiff's residual functional capacity as he did not perform in-depth testing of the claimant's mental functioning and only saw him for fifteen to twenty minutes every one to two months. (AR 23.)

part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). The district court need not review *de novo* those portions of a Report to which neither party objects. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n. 13 (9th Cir. 20015); *U.S. v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir. 2003) (*en banc*). Neither party filed an objection. On May 26, 2017, Plaintiff filed a motion for summary judgment claiming that the ALJ failed to properly consider his testimony. (Dkt. No. 16-1.) On June 29, 2017, Defendant filed a cross-motion for summary judgment and an opposition to Plaintiff's motion for summary judgment. (Dkt. No. 17-1.) The Court reviews Plaintiff's claim and **ADOPTS** the Report in part denying Plaintiff's motion for summary judgment and granting Defendant's cross motion for summary judgment.

### B. Standard of Review of Commissioner's Final Agency Decision

A district court has jurisdiction to review final decisions of the Commissioner of Social Security. 42 U.S.C. § 405(g). Section 405(g) permits the court to enter a judgment affirming, modifying, or reversing the Commissioner's final decision. (*Id.*) The matter may also be remanded to the Commissioner for further proceedings. (*Id.*) The scope of judicial review is limited, and the Commissioner's final decision should not be disturbed unless it is "not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotations and citations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (court "will disturb the denial of benefits only if the decision contains legal error or is not supported by substantial evidence.") Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (internal quotations and citations omitted). The evidence must be "more than a mere scintilla," but may be less than a preponderance. (*Id.*) Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Tommasetti*, 533 F.3d at 1038. Finally, the court will not reverse an ALJ's decision for

harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

For purposes of the Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "This provision establishes a severity and durational requirement for recognition of disabilities under the Act that accords with the remedial purpose of the Act to protect workers whose disability prevents them from earning a living for a significant period of time." *Flaten v. Sec. of Health & Human Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995).

## IV. DISCUSSION

### A. The ALJ Did Not Err in Assessing Plaintiff's Credibility

Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons for discounting his credibility and rejecting his subjective symptom testimony. (Dkt. No. 16-1 at 4.)

At steps four and five of the sequential evaluation process, the ALJ must determine the claimant's RFC. The ALJ must consider all relevant evidence in the record, including medical records, and "the effect of symptoms, including pain that are reasonably attributed to a medically determinable impairment." *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5). "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions that can be shown by objective medical evidence alone." SSR 96-8p, 1996 WL 374184, at *5; *see also* 20 CFR § 404.1529(c)(3).

In evaluating whether subjective complaints are credible, the ALJ must perform a two-step analysis. *Smolen v. Charter*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the ALJ must assess "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Second, if the first test is met and there is no evidence of malingering, "the ALJ can reject claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281. The ALJ determines "credibility, resolve[s] conflicts in the testimony, and resolves ambiguities in the record. *Treichler v. Comm'r of So. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

General findings are not sufficient; "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). The decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to . . . any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." (*Id.*)[6] The ALJ must provide "specific, cogent reasons for the disbelief" when it rejects the claimant's complaints. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("General [credibility] findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

An "ALJ may not discredit pain [or subjective symptom] testimony merely because a claimant's reported degree of pain is unsupported by objective medical findings." *Stewart v. Sullivan*, 881 F.2d 740, 743-44 (9th Cir. 1989).[7] In determining whether to reject

---

[6] *See Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) ("[An ALJ] must state which pain testimony is not credible and what evidence suggests the claimant[ ] [is] not credible.").

[7] The same framework applies to both subjective symptoms and pain. *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis.").

subjective symptom testimony, the ALJ may consider a "claimant's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991). The regulations provide that the Commissioner will consider the following factors relevant to subjective symptoms,

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3). In addition, the ALJ "[m]ay consider a range of factors in assessing credibility, including (1) 'ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) that claimant's daily activities.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1284).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not

entirely credible. (AR 19.) The ALJ did not address any affirmative evidence of malingering. Therefore, since the first step was met, the ALJ must have presented specific, clear and convincing findings to reject Plaintiff's testimony. *Smolen*, 80 F.3d at 1281.

The Magistrate Judge concluded that the ALJ provided specific, clear and convincing reasons to reject Plaintiff's subjective symptom testimony. (Dkt. No. 19 at 26.) The ALJ found that Plaintiff's testimony regarding his symptoms and limitations was not credible. (AR 19.) The ALJ provided the following five reasons for rejecting Plaintiff's testimony: (1) Plaintiff's condition had been stable with medication; (2) the "sparse level of detail" in treating doctor's notes; (3) conservative treatment regimen; (4) "benign" psychiatric examinations and the absence of evaluations of his cognitive functions; and (5) Plaintiff's ability to work after alleged onset of PTSD. (AR 19-22.) The Magistrate Judge concluded that while not all of the reasons set forth by the ALJ were clear and convincing, the ALJ articulated sufficient specific, clear and convincing reasons supported by substantial evidence to discount Plaintiff's subjective testimony. (Dkt. No. 19 at 26.) As described below, the Court will accordingly **ADOPT** the Magistrate Judge's Report in part.

### 1.    Stable Condition with Medication

Plaintiff argues his mental impairments affect his ability to complete tasks, remember, concentrate, understand and get along with others. (Dkt. No. 16-1 at 4.) Plaintiff also argues that he continues to have auditory hallucinations three to four days a week, which interfere with his concentration. (*Id.*) Plaintiff further argues he cannot concentrate and gets confused when others tell him to do something. (*Id.*) Finally, he argues that despite his medication regime, he cannot return to work. (*Id.*)

In discrediting Plaintiff's subjective symptom allegations, the ALJ first concluded that Plaintiff's condition had been stable with medication without reported side effects, even though he was noncompliant with his medication regimen at times. (AR 19.) The ALJ cites to instances where the claimant admitted "his nightmare medication [was] working" and that "his hydroxyzine medication was helping" with his recurrent panic attacks. (AR

19-20.) Further, the ALJ noted that during this time, Plaintiff denied having hallucinations and denied having sleep problems. (*Id.*) Significantly, the ALJ noted that claimant reported he was "content with the current [medication] regimen." (AR 20.) The ALJ also found that on December 3, 2014, Plaintiff described "a couple of severe panic attacks in the previous month, he denied hallucinations and delusions of any kind, and reported feeling that the medications were working fairly well." (*Id.*) The ALJ pointed out that Dr. Samorano had concluded that the claimant had fair control of his symptoms related to his depressive disorder. (*Id.*) The ALJ further noted that on December 17, 2014, the claimant reported he had allegedly been "in a panic attack for three hours due to a family crisis" and that his audio hallucinations had returned. (*Id.*) Dr. Samorano prescribed him a limited supply of diazepam to help the claimant with his panic disorder. (*Id.*) The ALJ notes that on Plaintiff's next visit on January 7, 2015, "he admitted that the addition of the diazepam helped him get through a family crisis purportedly involving panic attacks on two successive days." (*Id.*) The ALJ found that despite Plaintiff's allegations that he is unable to work due to his mental impairments, the record showed that his symptoms were stable with medication. (AR 19.) The ALJ could properly rely on such findings to discredit the alleged severity of Plaintiff's subjective symptoms. *See Bailey v. Colvin*, 659 F. App'x. 413, 415 (9th Cir. 2016); *Warre v. Comm's of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (holding that impairments that can be controlled effectively with medication are not disabling). *See also Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming a denial of benefits and noting that the claimant's impairments were responsive to medication).

The ALJ further noted Plaintiff's noncompliance with medications likely contributed to exacerbations of Plaintiff's symptoms. (AR 19.) Plaintiff does not argue that he was compliant with his medication. (Dkt. No. 16-1 at 4.) The basis of his allegation rests on the fact that the ALJ's finding was conclusory and did not include any citations. (*Id.*) The ALJ however, provided adequate citation to instances where Plaintiff reported

noncompliance with his prescribed medication regimen. For example, the ALJ noted that on June 6, 2014, during a visit in which Plaintiff reported he was severely depressed, he admitted to missing two to three doses of medication per week. (AR 19.) In addition, the ALJ cited to Plaintiff's visit with Dr. Samorano on August 8, 2014, in which Plaintiff reported feeling "depressed … super stressed." (*Id.*) Dr. Samorano noted Plaintiff's lack of compliance with his medication and counseled Plaintiff on the importance of adhering to his medication. (*Id.*) Furthermore, "[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated...." *Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012) (quoting *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir.2007)). *See also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (the failure to follow prescribed treatment may "cast doubt on the sincerity of the claimant's pain testimony."). Accordingly, the ALJ's discounting of plaintiff's subjective symptom testimony based on the fact that plaintiff's symptoms had been controlled with medication was clear and convincing.

### 2.    Sparse Level of Detail in Treating Doctor's Notes

The ALJ's second reason for discounting Plaintiff's testimony concerning his symptoms was the "sparse level of detail contained within treating psychiatrist Rogelio Samorano's progress notes … [which] belie[s] the intensity and resultant degree of limitation that has been alleged by the claimant…." (AR 19.) The ALJ noted that Plaintiff reported experiencing auditory derogatory hallucinations during multiple visits with Dr. Samorano. (*Id.*) The ALJ observed that Dr. Samorano's treatment and progress notes provided no indication as to the frequency, intensity, duration or content of Plaintiff's alleged hallucinations. (*Id.*) Observing that Dr. Samorano instructed Plaintiff on positive thinking when he reported the alleged hallucinations, the ALJ inferred that Plaintiff's symptoms were not as severe as he alleged because Dr. Samorano's notes "fail to demonstrate that the claimant has undergone appetite change, psychomotor change or

retardation, hyperactivity, motor tension, memory impairment, decreased energy, difficulty thinking or concentrating, or impairment impulse controls." (AR 22.) The Magistrate Judge did not agree with the ALJ that Dr. Samorano's records were "sparse in detail." In fact, the Magistrate Judge indicated that Dr. Samorano never made any indication in his records that he did not believe or find Plaintiff's symptoms to be severe. (Dkt. No. 19 at 23.) As such the Magistrate Judge did not find this reason to be a clear and convincing reason to discount Plaintiff's subjective testimony. (*Id*.) The Court agrees with the Magistrate Judge's Report and declines to find this reason to be clear and convincing.

Although the Court does not find this a clear and convincing reason for discounting Plaintiff's testimony, such a finding does not affect the ALJ's overall conclusion so long as substantial evidence remains to support the ALJ's conclusions on credibility. *See Carmickle v. Commissioner, Social Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility conclusion,]' such is deemed harmless and does not warrant reversal.") (citing *Batson v. Comm. of Soc. Sec. Admin.*, 359 F. 3d 1190, 1197 (9th Cir. 2004); *Tonapetyan v. Halter*, 242 F. 3d 1144, 1148 (9th Cir. 2001) (that some reasons for discrediting claimant's testimony should be properly discounted does not render an ALJ's determination invalid so long as that determination is supported by other substantial evidence).

### 3.    Conservative Treatment Regimen

The ALJ's third reason for discounting Plaintiff's testimony was based upon the use of conservative treatment. (AR 19-21.) An ALJ may properly rely upon the use of conservative treatment as a basis to discount Plaintiff's subjective testimony regarding the severity of an impairment. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."). During the period of the alleged disability,

Plaintiff's medications include, or have included the following medications for depression: Celexa, Trazodone, Mirtazapine, and Bupropion. (AR 40-41.) Plaintiff's antipsychotic medications include or have included: Seroquel, Quetiapine, and Risperidone. (*Id.*) Plaintiff's anxiety medications include, or have included: Hydroxyzine and Vistaril. Plaintiff has also been prescribed Diazepam (or Valium) and Prasozine for sleep. (*Id.*)

Here, the ALJ discounted Plaintiff's allegations on the basis of Plaintiff's medications regimen and the nature and scope of Dr. Samorano's visits with Plaintiff. (AR 19-21.) The ALJ noted that while Dr. Samorano occasionally modified Plaintiff's regimen to address specific concerns, there were no substantial changes to Plaintiff's treatment regimen. (AR 19-20) The ALJ further reported "Dr. Rogelio [Samorano] admitted himself that his visits with the claimant lasted for only fifteen to twenty minutes every one or two months." (AR 21.) The ALJ noted that when Plaintiff reported feeling stressed and depressed, Dr. Samorano would counsel him on positive thinking. (AR 20.) The ALJ therefore concluded Dr. Samorano's conservative and relatively unchanged treatment showed Plaintiff's subjective symptoms were not as severe as he alleged. (AR 19-20.)

The Magistrate Judge did not find the ALJ's third preferred reason for discounting Plaintiff's testimony to be clear and convincing. (Dkt No. 19 at 23-24.) While conservative treatment may include prescription medication, courts have found that multiple years of talk therapy, prescription antidepressants and prescription antipsychotics are not properly characterized as conservative treatment. *See*, *e.g., Mason v. Colvin,* No. 1–12–cv–00584 GSA, 2013 WL 5278932, at *6 (E.D. Cal. Sep.18, 2013) (plaintiff's treatment was not conservative where plaintiff took prescription antidepressants and antipsychotic medication for almost two years and received counseling from a psychiatrist and psychiatric social worker); *see also Baker v. Astrue,* 09–01078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Where mental activity

is involved, administering medications that can alter behavior shows anything but conservative treatment."). Accordingly, the Court cannot conclude that the ALJ's discounting of Plaintiff's subjective testimony based on a "conservative treatment regimen" was clear and convincing. However, as noted above, such a finding does not affect the ALJ's overall credibility conclusion. *Batson*, 359 F. 3d at 1197.

### 4. Psychiatric and Cognitive Evaluations

Next, the ALJ discounted the severity of Plaintiff's subjective symptom allegations because of the "benign"—cursory and lack of in-depth—psychiatric examinations and the absence of evaluations of cognitive functioning in the record. (AR 21.) Although a lack of medical evidence cannot form the sole basis for discounting subjective testimony, it is a factor the ALJ may consider in his credibility analysis. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

Here, the Court agrees with the ALJ that the psychiatric examinations in the record appear cursory and unchanged with very few exceptions since the amended alleged onset date. The ALJ noted that claimant was generally observed with casual dress and fair hygiene even on occasions where he appeared slightly disheveled; made good eye contact; has been assessed with normal rate, volume, and rhythm of speech with intact language; has a normal fund of knowledge; has intact recent and remote memory, concentration, attention span, and associations; and fair judgment and insight. (AR 21.) The ALJ further reported "the claimant's mental functioning has not been evaluated to the extent that one would expect to see if the claimant's impairment-related limitations were as limiting as alleged by the claimant." (*Id.*) The ALJ also observed the lack of examination relating to Plaintiff's allegations of his inability to concentrate. (*Id.*) To the contrary, the ALJ observed Dr. Samorano's notes indicated that Plaintiff had consistently been assessed with intact attention span and concentration. (AR 20-21.) This minimal level of medical evidence supports the ALJ's credibility determination. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (discrediting plaintiff's subjective symptom testimony regarding mental

limitation where Doctor had performed neurological evaluation stating that claimant's "memory, orientation, judgment, intellect, and affect are within normal limits.").

### 5. Ability to Work

The ALJ's final reason for discounting Plaintiff's subjective testimony is that Plaintiff was able to work after the onset of his PTSD in 1992. (AR 21.); *see Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (providing that an ALJ may properly consider a claimant's work record when weighing a claimant's credibility). The impartial medical expert testified that the claimant's ability to work at substantial gainful activity levels after his alleged triggering incident—but prior to his amended alleged onset date— may indicate that the claimant's current PTSD symptoms are not as severe as alleged. (AR 21.) The ALJ agreed with the medical expert and observed that Plaintiff was not previously prevented from working despite the presence of his alleged impairment at approximately the same level. (*Id.*) The ALJ noted that this was just one factor in assessing Plaintiff's credibility, but nevertheless concluded that it was significant in discounting Plaintiff's subjective symptom allegations. (*Id.*) To the extent that Plaintiff's medical record reveals some changes, the ALJ concluded that such changes were relatively minor and based on his subjective reports that he experienced changed moods. (*Id.*)

The Court is not convinced that Plaintiff's post-1992 work record is a clear and convincing reason to discount Plaintiff's subjective symptom testimony. Specifically, the 1992 date relates only to the triggering date of Plaintiff's PTSD, whereas Plaintiff now suffers from Major Depressive Disorder, Recurrent, Specific with Psychotic Behavior, Panic Disorder without Agoraphobia, in addition to Post-Traumatic Stress Disorder (PTSD). (AR 13.) A review of the entirety of the record shows that Plaintiff's condition appears to have significantly changed between 1992 and the amended alleged onset date in May 2014, including *inter alia* a period involving suicidal ideations in 2012, and a suicide attempt in 2013. Accordingly, plaintiff's work record prior to the amended onset date is of limited relevance in discounting Plaintiff's subjective symptom testimony, and thus is

not a clear and convincing reason to discount Plaintiff's subjective symptom testimony.

Nevertheless, the Court will accept the ALJ's overall adverse credibility determination because the ALJ provided at least two specific clear and convincing reasons—stable condition with medication and the lack of psychiatric and cognitive evaluations—that were sufficiently supported by substantial evidence. *See Weetman v. Sullivan*, 977 F.2d 20, 22 (9th Cir. 1989) (ALJ's assessment of symptom severity and credibility is entitled to "great weight."); *Batson*, 359 F. 3d at 1197 (error is harmless where there remains "substantial evidence supporting the ALJ's conclusions on . . . credibility" and any error "does not negate the validity of the ALJ's ultimate [credibility] conclusion.").

## B. Treating Physician's Opinion

While Plaintiff does not raise this argument, the Court recognizes the general rule that the ALJ should provide greater weight to the opinions of a treating physician. *See Smolen v. Chater,* 80 F.3d 1273, 1285 (9th Cir.1996) ("Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians.").

As a threshold matter, the Court finds that any argument that Dr. Samorano's opinion should have been afforded greater weight as a treating physician—including his opinion that Plaintiff could not work without taking four days off in a month—has been waived by Plaintiff. *See Brooks v. Barnhart*, 118 F. App'x 167, 169 (9th Cir. 2004) ("petitioner did not raise this argument before the district court and it is therefore waived"); *Laronge v. Berryhill*, 685 F. App'x 519, 521 (9th Cir. 2017); *Valdez v. Berryhill*, No. SA CV 16-0980 JCG, 2018 WL 317799, at *1 (C.D. Cal. Jan. 5, 2018) ("Similarly, as a general rule, issues not properly raised before the district court may be deemed waived."). Plaintiff's Motion for Summary Judgment—which is Plaintiff's sole briefing at issue in this Order as Plaintiff did not file any opposition to Defendant's Motion for Summary Judgment or Objections to

the Report—does not raise this argument. *See generally* (Dkt. No. 16.)

Moreover, even if Plaintiff were to have made this argument, the Court observes that the ALJ provided specific and legitimate reasons to discount Dr. Samorano's opinion as a treating physician regarding Plaintiff's residual functional capacity.[8] *See, e.g., Aukland v. Massanari*, 257 F.3d 1033, 1037 (9th Cir. 2001) (requiring ALJ to "make findings setting forth specific, legitimate reasons" for rejecting the opinion of a treating physician that are based on "substantial evidence in the record.").

Specifically, the ALJ pointed out inconsistencies between Dr. Samorano's statement in a medical source statement that Plaintiff had a "poor response to pharmacotherapy," while the doctor's own treatment records showed "relatively benign findings, minimal treatment, minimal overall change in the claimant's current medication regimen," which led the ALJ to conclude that "such evidence is likewise inconsistent with Dr. [Samorano's] opinion that the claimant would likely miss more than four days per month due to impairments or treatment." (AR 22.) Moreover, the ALJ found that Dr. Samorano had an insufficient basis to opine on Plaintiff's residual functional capacity, given that the doctor had made relatively benign psychiatric findings, and because there was no indication of in-depth testing performed of the claimant's mental functioning. (AR 23.); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that an ALJ need not accept the opinion of a doctor that is inadequately supported by clinical findings). The ALJ further observed that Dr. Samorano's medical statement included a subjective statement regarding plaintiff's problems entering the workforce that was made by Plaintiff and did not reflect Dr. Samorano's medical opinion. (AR 24.) Accordingly, while uncontested by Plaintiff, the Court observes that the ALJ provided specific and legitimate reasons to discount the testimony of Plaintiff's treating physician. *See Magallanes v. Bowen*, 881 F.2d 747, 751

---

[8] This Court has the power to *sua sponte* review issues not raised by the parties in a social security case. *See Asmar v. Colvin*, No. 16-CV-01079-GPC-MDD, 2017 WL 3405688, at *9 n.7 (S.D. Cal. Aug. 9, 2017) (collecting cases); *Farley v. Colvin*, 231 F. Supp. 3d 335, 339 (N.D. Cal. 2017) (same).

(9th Cir. 1989) (ALJ need not accept treating physician's opinion which has "little in the way of clinical findings to support [its] conclusion.); *Morgan v. Comm'r of Social Security*, 169 F.3d 595, 602-03 (9th Cir. 1999) (noting that ALJ's can properly discount treating physician's opinion based on inconsistent medical evidence and where the treating physician relies on the subjective complaints of the claimant); *Seltser v. Comm'r of Soc. Sec.*, No. 12-CV-2590-LAB-WVG, 2014 WL 1292904, at \*2 (S.D. Cal. Mar. 28, 2014) (treating physician's opinion only receives "controlling weight if it's well-supported by established diagnostic techniques and [is] not inconsistent with other evidence.") (quoting 20 C.F.R. § 404.1527(c)(2)).

## CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the Administrative Law Judge applied the correct legal standards when he denied Plaintiff's claim and that his conclusions are supported by substantial evidence. For the foregoing reasons, the Court will **ADOPT** the Magistrate Judge's Report in part **DENYING** Plaintiff's Motion for Summary Judgment and **GRANTING** Defendant's Cross Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: March 27, 2018

Hon. Gonzalo P. Curiel
United States District Judge